Mr. Justice Moore
delivered the opinion of the Court.
We will refer to the parties by name, or as they appeared in the trial court where defendants in error were plaintiffs and plaintiffs in error were defendants.
The action was brought by plaintiffs to recover damages, actual and exemplary, resulting from an alleged aggravated assault and battery upon them by defendants. Numerous other parties were drawn into the case by defendants whose third party complaint sought to recover damages against plaintiffs and others allegedly responsible for what they asserted was an unwarranted *296 assault upon them, unlawful arrest, false imprisonment of their persons, and malicious prosecution. None of the third party defendants is involved in this writ of error.
After issues were framed the case was tried to á jury and verdicts were returned in favor of plaintiffs, aggregating $45,000.00. The jury by its verdicts further found that in committing the tort complained of defendants were guilty of malice, insult, and a reckless and wanton disregard of the rights and feelings of the plaintiffs. Upon this finding the court entered judgment for the issuance of execution against the body of each of the defendants. The record is voluminous, consisting of 3642 folios, all of which has been carefully examined and analyzed with relation to the grounds which have been urged for reversal of the judgment.
We do not attempt in this opinion to give a detailed statement of the evidence introduced at the trial. A general statement with regard to the nature of the action and events out of which it arose will suffice to give meaning to the points argued by counsel for defendants.
On the morning of March 10, 1958, Winston P. Boyer, who resides in Moab, Utah, together with his brother George T. Boyer and their uncle Roy E. Spicer, traveled from Denver to the Air Force Academy near Colorado Springs, Colorado. There by prearrangement they met a truck driver who had been engaged to do some hauling for them. Certain material was selected at the Academy which was to be used by Winston Boyer in a contemplated house building project at Moab, Utah. These four men spent the day in selecting the material which they desired and loading it on the truck. Their labors were completed late in the afternoon, after which they all proceeded from the Academy to a weighing station, where they were delayed by authorities because of some overloading of the truck. The truck finally cleared the weighing station at about 7:00 P.M. The Boyers and Spicer then proceeded toward Denver via the Valley Highway in the Boyer sedan with George *297 Boyer driving, and, arriving at Castle Rock they stopped for dinner at a restaurant with a connecting bar, at which time, before and during their meal, Winston Boyer and Spicer each consumed three drinks of whiskey. George Boyer had two similar drinks before dinner, which he consumed within a period of fifteen minutes. Winston and Spicer consumed their drinks within forty minutes. They had arrived at Castle Rock at 8:00 P.M. and left for Denver at 9:30 P.M. They proceeded from Castle Rock toward Denver until they arrived at a tavern called the “Flame” where they stopped and each consumed an additional quantity of whiskey. The party then drove about twelve miles to Writer’s Manor on South Colorado boulevard in Denver where they arrived at approximately 11:30 P.M. Spicer wanted to cash a check but was disappointed in doing so because of the absence of a party he knew who he expected would approve his check. The three of them then proceeded into the bar where George admittedly attempted twice to serve himself by reaching over the bar in an effort to grab a bottle of liquor. George admits that on one such attempt he did in fact succeed in placing a small quantity of liquor in his coffee cup. According to the testimony of the bartender there were three attempts to take whiskey from behind the bar, and on each of the occasions George succeeded in getting an ounce or an ounce and one-half of whiskey.
Winston, George and Spicer were sitting at the west end of the bar which was tended by a Mr. Woodrow Wilson. Coffee was first served to the Boyers and a whiskey highball to Spicer. After the Boyers consumed their coffee George reached over the bar for a bottle of liquor and according to Wilson began pouring some of its contents into the cup. The taking of any liquor at that time was disputed by the Boyers. Wilson testified that George took about one and one-half ounces of liquor. It is the undisputed testimony of George that the “bartender came over and took the bottle from me,” *298 and said “Leave the liquor alone.” The bartender replaced the bottle in the well back of the bar from where it was taken. George then left the bar and went to the coffee shop for more coffee. After consuming the second cup of coffee he again reached over the bar and took the same bottle. He admits that at that time he took a small amount of liquor. Again the bartender took the bottle away from him and according to Wilson he said to him, “I want you to leave the liquor alone.” Wilson then reported those incidents to Carl Harthun, the other bartender who was also in charge of the place. Harthun exchanged stations with Wilson. Harthun again observed George reaching for the bottle and saw him again pour whiskey into his coffee cup. The Boyers deny taking any whiskey at that time; at any rate, Harthun again took the bottle from George and told him: “We serve the customers, the customers don’t serve themselves.” George then left for another cup of coffee, followed by Harthun, who said, “I wish that you and your party would leave.” George’s answer, according to Harthun, was: “You damn bartenders won’t give us any service, and we have to serve ourselves.” Harthun then went into the lobby and telephoned for police protection.
After the conversation with Harthun, George again left the bar for a fourth cup of coffee and upon his return noticed two policemen talking with Harthun. These police officers were the plaintiffs Elkins and Bullock and were in full uniform. They had a five minute conference with Harthun, who related what had happened. The record shows that Elkins and Bullock then approached the Boyers; that they informed them that the management wanted them to leave and asked them to finish their coffee and go. The remarks of George and Winston to the officers can be well characterized as “smart-alecky,” insolent and somewhat defiant, and quite within the realm of what one might hear from an inebriate. During this time, although denied by the Boyers, one of them swung at Elkins, and Elkins *299 started to remove them from the place, at which time the Boyers demanded to know what the charges were. The reply of the officers was that there were no charges as'•■yet but there would be unless they left willingly. George Boyer had to be handcuffed, and ultimately, after a fight in which Elkins was kicked into unconsciousness and Bullock was knocked into insensibility, the two Boyers were subdued upon the arrival and with the help of several other policemen. One of the Boyers was placed in the patrol car and the other in another police cruiser and taken to the police station. There is ah abundance of testimony that both Boyers were inebriated and fighting drunk, that they were loud, noisy, profane and were disturbing the peace in a public place. Elkins and Bullock were taken to the hospital, both with serious injuries.
The argument for reversal of the judgments is presented under several captions as follows:
I. “The trial court erred in failing to submit to the jury the issues of whether or not officers Elkins and Bullock lawfully arrested George and Winston Boyer and whether or not George and Winston Boyer had a right to resist such arrests.
II. “The damage verdicts returned by the jury were excessive and unreasonable in relation to the alleged injuries incurred by the plaintiffs, were unsupported by the evidence, and bore no relation to proximate cause.
III. “The defendants were deprived of a fair trial by reason of improper opening statements on the part of plaintiffs’ counsel.”
Point I above is grounded on the refusal of the trial court to give instructions tendered by the defendants, based upon the proposition that the plaintiff police officers were engaged in making an unlawful arrest of the defendants and that they had a right to resist the unlawful conduct of the plaintiffs with such force as *300 was necessary to prevent the illegal arrest comtemplated by the plaintiffs.
The instructions given by the court, in effect, told the jury that the attempt to arrest the defendants was lawful; and the question as to whether the plaintiffs used more force than was necessary to accomplish their purpose was given to the jury for determination under the following instruction (among others of similar import):
“The Court instructs the jury that if you do not find from a preponderance of the evidence that in effecting the arrest of the defendants, Winston P. Boyer and George T. Boyer, either or both of them, the plaintiffs, Richard L. Elkins and James A. Bullock, either or both of them, used more physical force than was reasonably necessary under all of the circumstances of the case to effect the arrest, then and in that event, you are instructed that the defendants, Winston P. Boyer and George T. Boyer, either or both of them, cannot recover upon their counterclaim against the plaintiffs, Richard L. Elkins and James A. Bullock, either or both of them.”
We have examined all the instructions which were tendered by defendants and denied by the court, and find no error. There was no sufficient evidence received upon the trial to warrant the giving of these instructions, assuming arguendo, that they were correct statements of legal principles applicable to a case in which the evidence would justify their application.
C.R.S. ’53, 39-2-20 (Permanent Supplement) enacted in 1955, provides:
“Any provision of this chapter prior to the effective date of this section to the contrary notwithstanding, an arrest may be made by any officer or by a private person without a warrant, for a criminal offense committed in his presence; and by an officer, when a criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it.” (Emphasis supplied.)
*301 Section 211.1-2 of the Revised Municipal Code of the City and County of Denver provides that police officers “ * * * shall have the power to arrest all persons found, in the act of violating any law or ordinance or aiding or abetting in any such violation, and shall arrest any person under circumstances which would warrant a reasonable man in believing that such person had committed or is about to commit a crime.”
We have held in recent decisions that the violation of municipal ordinances is a criminal offense in this State. Canon City v. Merris, 137 Colo. 169, 323 P. (2d) 614; Geer v. Alaniz, 138 Colo. 177, 331 P. (2d) 260; Zerobnick v. Denver, 139 Colo. 139, 337 P. (2d) 11.
In the instant case there is no question as to whether an offense had been committed. The degree thereof is all that is sought to be minimized by the defendants. There was an abundance of evidence that the defendants were very much under the influence of liquor, that they were “fighting drunk.” Their conduct was such as to require the manager in charge of a reputable place of business to call for police protection. There isn’t the slightest competent evidence in this-record which would deprive the plaintiffs of the protection afforded to them by the statute and the ordinance hereinabove quoted. We hold, under the facts disclosed by this record, that as a matter of law the defendants had committed a criminal offense or offenses, and that as a matter of law the plaintiffs had reasonable ground for believing that the defendants had committed such offense or offenses. The attempted arrest of the defendants was altogether lawful and the plaintiffs would have been derelict in the performance of their duty had they refused to act. There was' overwhelming evidence that the plaintiffs did not use more force than was necessary to effect the arrest.
The argument that the damages are excessive is with *302 out merit. The judgments entered in favor of plaintiff Elkins were as follows:
Against Winston Boyer, $10,000.00 actual, and $2,500.00 exemplary damages, and against George Boyer, actual damages in the amount of $15,000.00 and exemplary damages in the amount of $2,500.00.
The judgments in favor of plaintiff Bullock were as follows:
Against Winston Boyer, $5,000.00 actual and $2,500.00 exemplary damages, and against George Boyer $5,000.00 actual and $2,500.00 exemplary damages.
The jury was properly instructed on the subject of damages, and the amount to be awarded is a matter very largely within the discretion of the jury. Unless a clear abuse of discretion is shown, this court will not interfere with the finding of a jury in such circumstances. City of Pueblo, et al., v. Ratliff, 137 Colo. 468, 327 P. (2d) 270.
There is nothing in this record to warrant discussion of the contention that the plaintiffs’ attorney made improper comments in his opening statement to the jury. No objection was made to any such statement at the time of trial, and the point was urged for the first time in an amended motion for a new trial. Present counsel for defendants, who did not participate in the trial, caused the amended motion for new trial to be filed in which the point was raised even though no objection was entered when the claimed prejudicial remarks were made. The alleged objectionable statements were of little significance, being conclusions drawn by the plaintiffs’ attorney from facts he intended to prove. The attorney who represented the defendants considered the statements to be lacking in prejudicial effect and made no objection thereto. The trial court instructed the jury that the statements of counsel were not evidence, and there is no showing whatever that any prejudice resulted to the defendants by reason thereof.
*303 One further point urged for reversal is directed to the judgment authorizing the issuance of an execution against the body of each defendant. It was shown in evidence that the defendants were accused of violations of municipal ordinances based upon the facts herein-above mentioned. A trial was had in the municipal court of Denver and the defendants were acquitted. It is contended that C.R.S. ’53, 77-9-3, (the body judgment section of the statute) as applied to the defendants under the above factual situation, deprives them of equal protection of the law as guaranteed by the constitution of the United States. The statute provides that an execution shall not be issued against the body of any person when he “shall have been convicted in a criminal prosecution for the same wrong.” To like effect is R.C.P. Colo. 101 (a).
It is argued that C.R.S. ’53, 77-9-3, and Rule 101 (a), C.R.C.P., provide that in no case may execution issue against the body of a person when the person “shall have been convicted in a criminal prosecution for the same wrong,” and that ordinance violations prosecuted in the municipal court of Denver are “criminal proceedings” within the meaning of the statute and the rule.
It is further argued that:
“As applied to the circumstances here, C.R.S. ’53, 77-9-3 and Rule 101 (a) make a distinction between a person that has been convicted of a criminal offense, and a person that has been acquitted. The statute and the rule provide that a person convicted of a criminal offense is immune from body execution, but a person acquitted of a criminal offense charge is denied this immunity. It is submitted that this differentiation between the convicted and the acquitted violates the equal protection clause of the Fourteenth Amendment of the United States Constitution.
“If a statute attempts to grant one class of persons a right not available to another class, the discrimination must not be arbitrary and must be based on some rea *304 sonable relationship to the lawful purpose sought to be obtained.”
We cannot agree with this argument. The distinction drawn by the legislative enactment, and by Rule 101 (a), between one who has been convicted of a criminal offense and one who has been acquitted has a relationship to the purposes sought to be accomplished, and the classifications mentioned are not “supported by mere fanciful conjecture” as argued by counsel. The person who has been convicted and presumably punished by infliction of the penalty imposed by law, cannot be required to suffer a second “punishment” under the law governing execution against the body in civil actions. Grant v. Gwyn, 148 Colo. 56, 365 P. (2d) 256. The classification thus created is reasonable and does not offend the equal protection clause of the United States constitution.
The judgments are affirmed.
Mr. Justice Pringle not participating.